IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

    vs.                                                    Case Number: 09-CR-3071 WJ

ABRAHAM BOBADILLA-CAMPOS and
BIANCA SANCHEZ-CABALLERO,

    Defendants.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION IN LIMINE RELATING TO OPINION EVIDENCE

THIS MATTER comes before the Court upon a Motion in Limine Relating to Opinion Evidence filed by Defendant Sanchez-Caballero on December 5, 2011 (**Doc. 120**). The Court previously denied Defendant's motion for a *Daubert* hearing. Doc. 106. Defendant subsequently filed the instant motion, noting that the Court's Order did not address the opinion evidence of one of the Government's proposed expert witnesses, Robert Almonte, United States Marshal for the Western District of Texas. The Court held an evidentiary hearing on the matter, considered the parties' briefs and oral argument on the matter, and now finds that Defendant's motion is not well-taken and will be denied.

### BACKGROUND

Defendant Bianca Sanchez-Caballero was charged with conspiracy and possession with intent to distribute more than 500 grams of a mixture or substance containing methamphetamine. Among the exhibits the Government intends to introduce at trial is a prayer card found on Defendant which depicts the image of "Jesus Malverde," a figure fairly prevalent in Mexican culture. The Government seeks to introduce the testimony of Marshal Almonte who will opine

that Jesus Malverde is a popular icon among drug traffickers and is revered as the patron "saint" of drug traffickers.  Marshal Almonte will testify that many drug traffickers, particularly couriers, pray to Jesus Malverde for protection from law enforcement.

The Government stresses two facts worth repeating here.  First, although Jesus Malverde is commonly known as the "Narco-Saint," the Catholic Church does not recognize him as a saint.  Evidence was presented that there is a shrine for Jesus Malverde in Mexico in Culiacan, Sinaloa, but no one is certain whether he ever existed.  Second, the Government acknowledges that Jesus Malverde is revered by many law-abiding people, and the presence of Jesus Malverde paraphernalia does not necessarily mean that someone is involved in drug trafficking.

## DISCUSSION

Defendant challenges Marshal Almonte's qualifications as an expert and the reliability of his testimony.  In *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 597 (1993), the United States Supreme Court explained that Rule 702 assigns to the district judge a gatekeeping role to ensure that scientific testimony is both reliable and relevant.  *See also Dodge v. Cotter Corp*., 328 F.3d 1212, 1221 (10th Cir. 2003) (trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline).  The gate-keeping function involves a two-step analysis.  First, the Court must determine whether the expert is qualified by "knowledge, skill, experience, training or education" to render an opinion.  *See* Fed.R.Evid. 702.  Second, if the witness is so qualified, the Court must determine whether the expert's opinions are "reliable" under the principles set forth under *Daubert* and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).  *See Ralston v. Smith & Nephew Richards, Inc*., 275 F.3d 965 (10th Cir. 2001).

To assist in the assessment of reliability, the Supreme Court in *Daubert* listed four

nonexclusive factors that the trial court may consider: (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community. 509 U.S. at 593-94, 113 S.Ct. 2786.  As noted, the list is not exclusive, and district courts applying *Daubert* have broad discretion to consider a variety of other factors.  *Kumho Tire*, 526 U.S. at 150; *see also Dodge*, 328 F.2d at 1222.

Under *Kumho Tire*, a reliability finding is a prerequisite for *all* expert testimony in areas beyond the knowledge and experience of lay jurors, not just technical or scientific evidence.  In *Kumho Tire*, the United States Supreme Court emphasized that the *Daubert* factors are not a "definitive checklist or test" and that a court's inquiry into reliability must be "tied to the facts of a particular case." *Id*. at 150.  Also, according to the *Kumho Tire* decision, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id*. at 152.

**I.     Qualifications**

Defendant claims that Marshal Almonte's proposed testimony is grounded in cultural anthropology and theology, not law enforcement, and thus his experience and background in law enforcement does not render him qualified to offer such testimony.  One cannot disagree with Defendant's position that both cultural anthropology and theology are established academic and scientific disciplines, and there would be a problem with Marshal Almonte's qualifications if his testimony fell within these categories.  However, the Government contends that Marshal Almonte's opinion falls into the purview of law enforcement because it relates to the "tools of

3

the trade" used by drug traffickers.[1]   The Court agrees with the Government that the use of Jesus Malverde paraphernalia in a drug trafficking scheme falls into admissible testimony concerning "tools of the trade."

*Daubert* requires that an expert possess "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation." *Lifewise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004).  Marshal Almonte is certainly qualified under this standard to discuss "tools of the trade" in a drug trafficking context.  He has had almost thirty years experience with the El Paso, Texas, Police Department, part of which time was spent as both a detective and supervisor within the narcotics unit, and then as deputy chief.   After retiring in 2003, Marshal Almonte started his own training business for law enforcement related to drug interdiction, which he discontinued after being appointed and confirmed as United States Marshal for the Western District of Texas.  He has testified in state and federal courts about Jesus Malverde and/or "Santa Muerte," another illegitimate or folk saint who is even more popular among drug traffickers than Jesus Malverde.  Tr. at 13.[2] Supplicants pray to both Jesus Malverde and Santa Muerte for protection from law enforcement or others whom they consider to be their enemies.  Tr. at 25.

Marshal Almonte has been personally involved in about fifty cases where Jesus Malverde paraphernalia was recovered in connection with drug investigations, and has been involved tangentially in hundreds of such cases, including conversations he has had with law enforcement

---

[1] *See* discussion, infra, on case law allowing evidence and testimony concerning "tools of the trade."

[2] "Tr." refers to the Transcript of the hearing on the instant motion, which has been filed with the Court.  *See* Doc. 140.

officers and photographs and case information he has reviewed.  Marshal Almonte has visited numerous shrines for other patron saints, both legitimate (that is, canonized by the Catholic Church) and illegitimate, and has put hundreds—maybe thousands—of hours into researching the subject.  Tr. at 17.  As part of this research, he has created and produced a law enforcement training video called "The Patron Saints of the Mexican Drug Underworld."  Ex. 1.[3]  The Court notes that Marshal Almonte's testimony regarding a similarly popular icon among drug traffickers, Santa Muerte, has been previously accepted by the district court for the Western District of Texas as admissible evidence.  *See United States v. Javier Guererro, et al.*, Criminal No. 09-820 AM, Doc. 454; *see also* Government's Exhibit 1.  The district court there found that Marshal Almonte had invested thousands of hours of research on this topic, and lectured on the precise subject at hundreds of law enforcement seminars across the country.  *See* Ex. 1 at 3.

      The Court rejects Defendant's contention that the subject of Marshal Almonte's opinion cannot be considered "tools of the trade" because some individuals who are not involved in drug trafficking also pray to Jesus Malverde.  This contention plays neatly into the very reason why Jesus Malverde paraphernalia *can* be considered as "tools of the trade": these items are perfectly legal, and yet can be used illegitimately in a drug trafficking scheme.  *See United States v. Triana*, 477 F.3d 1189, 1195 (10th Cir. 2007) (describing scales, glass pipes, and plastic baggies as "tools of the drug trade"); *United States v. Verners*, 53 F.3d 291, 297 (10th Cir. 1995) (observing laboratory equipment, scales, guns, ammunition, packaging materials, and profits as tools of the drug trade).  Thus, scales, firearms, packaging materials, laboratory equipment and

---

[3] The Court reviewed the videotape ("Patron Saints of the Mexican Drug Underworld") and found it informative and professionally produced.  In this overview, Marshal Almonte included different "saints" revered by drug traffickers, including Jesus Malverde, as well as the use of different tangible icons used in connection with this underworld.

plastic baggies are, on their face, legitimate non-contraband, but they can still be "tools of the drug trade" depending on the context where they are found or how they are used.  For example, it would not be uncommon to have a prayer card, a medallion that depicts both Jesus Malverde and the Virgin of Guadalupe (the latter being a legitimate saint canonized by the Catholic Church), and yet, depending on the context of where and how these items were found, an inference may be made which relates to drug trafficking.

Accordingly, the Court finds that Marshal Almonte is qualified to give an expert opinion under *Daubert*, and Defendant's objections to Marshal Almonte's qualifications as an expert witness are overruled.

## II.    Reliability

Defendant challenges the reliability of Marshal Almonte's testimony under *Daubert*, focusing mainly on the lack of testing by scientific method and the paucity of scholarly journals on the subject.  *See* Tr. at 39.  This plan of attack misreads the requirements of *Daubert's* gatekeeping inquiry for reliability because the *Daubert* factors "do not constitute a definitive checklist or test."  509 U.S. at 593.  In fact, those factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."  *Kumho Tire*, 526 U.S. at 138.  In *Smith v. Ingersoll-Rand Co.*, the Tenth Circuit set forth the reliability inquiry this way:

> The purpose of the *Daubert* gatekeeping function is not to measure every expert by an inflexible set of criteria but to undertake whatever inquiry is necessary to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

214 F.3d 1235, 1243 (10th Cir. 2000) (quoting *Kumho Tire*, 526 U.S. at 152).

Defendant asserts that Marshal Almonte's opinion is not reliable because it is too huge a leap "to go from cell phones [and] pagers to religious belief as a "tool of the trade." Tr. at 76. Defendant argues that such a broad definition of "tool of the trade" would allow the Government to target individuals who wear the Christian cross as drug traffickers because a large number of people who are Christians wear crosses. The Government aptly finds the holes in this argument. Drug trafficking does not have the same connection to the Christian cross as does Jesus Malverde paraphernalia. The cross, or the worship of legitimate saints, are common symbols used for a multitude of purposes. They both have a "less frequent appearance" in drug trafficking cases than does paraphernalia associated with Jesus Malverde or Santa Muerte. *See* Tr. at 85. There is no indication that the wearing of a Christian cross occurs in the context of drug trafficking frequently enough to infer a connection between the two, so there is no danger that individuals will be targeted for their religious beliefs, as Defendant contends. Moreover, prayer to Jesus Malverde, as opposed to legitimate saints, holds the dubious distinction of seeking protection from law enforcement. As the Government noted at the hearing, "Jesus Malverde is for people that operate outside the law." Tr. at 88.

Defendant also infers that the proffered testimony attempts to profile individuals by their socioeconomic level because Jesus Malverde is revered largely by "poor and marginalized Mexican Catholics." Tr. at 81. However, the statistical reality is that the overwhelming population in the Sinaloa area in Mexico are poor. Further, the fact that Jesus Malverde paraphernalia was found on Defendant—who is not from Mexico, but is an American who allegedly "just so happen[ed] to be on a drug run" (Tr. at 86) undercuts any attempt to tie the proffered testimony to a specific socioeconomic class.

Opinion testimony on "tools of the trade" is not the kind of subject that lends itself to

technical scientific inquiry.  Nevertheless, reliability on this subject matter is established through the collective knowledge and experience of law enforcement officials.  Marshal Almonte testified at the hearing that his opinion on the connection between Jesus Malverde paraphernalia and drug trafficking is accepted by peers in law enforcement.  Tr. at 68.

There is no reason to re-invent the wheel here: the reliability of expert testimony dealing with "tools of the trade" has been well recognized by courts, including the Tenth Circuit.  *See, e.g.*, *U.S. v. Burkley*, 513 F.3d 1183, 1189 (10th Cir. 2008) (expert witness testified that defendant's possession of more than one cell phone was a common practice in drug trade) (citing *U.S. v. Cox*, 934 F.2d 1114, 1121 (10th Cir.1991) (indicating that possession of pager is evidence of intent to  distribute));  *U.S. v. Perez*, 280 F.3d 318, 342 (3rd Cir. 2002) (expert testimony presented to explain how drug traffickers use cell phones to frustrate police investigators who are trying to find the location of a drug delivery or to intercept numeric coded messages).

Further, the reliability of the proposed testimony has been sufficiently established, where evidence of the connection between worship of Jesus Malverde and drug trafficking has been accepted in numerous courts.  As the Government points out, courts (even this district), have widely referred to Jesus Malverde as a "narco saint."  *See United States v. Beltran-Aguilar*, 412 Fed. Appx. 171, 173 (10th Cir. 2011) (referring to Jesus Malverde as "the patron saint of drug smugglers"); *United States v. Lopez-Gutierrez*, 334 Fed. Appx. 880, 881–82 (10th Cir. 2009) (observing that Jesus Malverde "is considered a patron saint by some drug traffickers"); *United States v. Briseno*, 163 Fed.Appx. 658 (10th Cir. 2006) (court acknowledged trooper's observation, based on his training of experience, that "the Jesus Malverde emblem as being associated with drug dealers"); *United States v. Pena-Macedo*, 2008 WL 3992135 (noting that Jesus Malverde is "widely known as the patron saint of drug dealers, or the 'narco saint'")

(D.N.M. April 28, 2008). Other federal district courts in this Circuit, and other circuits, have also treated or considered Jesus Malverde paraphernalia as relevant evidence.[4]

In *U.S. v. Rivas*, 2003 WL 22400238 (D.Neb. 2003), the district court directly considered the admissibility of testimony related to "The Narco Saint." During defendant's arrest for amphetamine possession, officers found, sitting in plain view on the center console of the vehicle, a prayer card with a picture of Jesus Malverde. The court ruled that it would admit the picture, and permit expert testimony to establish that drug traffickers operating out of Sinaloa, Mexico (where defendant came from), frequently carry medallions or other objects bearing the likeness of Jesus Malverde. The *Rivas* case is convincing, because the research conducted by the Government's witness in that case was far less substantial and far-reaching than the research done by Marshal Almonte.[5] Also, the *Rivas* court admitted this evidence subject to the

---

[4] *See United States v. Lopez-Gutierrez*, 2006 WL 3373909 at *5 (D. Utah November 21, 2006) (in assessing whether officer had reasonable suspicion, court considered officer's observation of a Jesus Malverde picture which the officer knew was the patron saint of drug traffickers); *United States v. Robles*, 313 F. Supp.2d 1206, 1210 (D. Utah 2004) (court determined that reasonable suspicion existed, because of, *inter alia*, the presence of a Jesus Malverde icon, which the investigating officer testified was "associated with drug trafficking" and which he had encountered in six or seven major drug investigations). *See also United States v. Caballero*, 417 Fed. Appx. 500, 503 (6th Cir. 2011) (describing Jesus Malverde "the 'patron saint' of drug traffickers"); *United States v. Villarreal*, 2010 WL 3980229 at *6 (N.D. Ind. Oct. 8, 2010) (referring to Jesus Malverde as "an icon of drug traffickers"); *United States v. Aguilar*, 2007 WL 3562952 at *2 (D. Neb. November 14, 2007) (acknowledging officer's recognition of Jesus Malverde as a "patron saint" of drug couriers, and noting that "while investigating cases over [officer's] five years with the interdiction unit and his last 10 years with the state patrol, [officer] had never had an individual in possession of such a card who was not either involved in an ongoing case or carrying contraband"); *see also United States v. Varela-Delgado*, 547 F.Supp.2d 704 (W.D. Tex. 2008) (in determining consent to search home was involuntary, court observed, without critique, that officers believed that Jesus Malverde is the patron saint of narcotic smugglers).

[5] The research done by the expert in *Rivas* was limited to "asking around and doing some research." 2003 WL 22400238, *1.

9

Government informing the jury that Jesus Malverde is not recognized as a saint by the Catholic Church and that law-abiding people also honor him.  *Id*. at *2.  This is exactly what the Government intends to do in this case.

Defendant presents some cases which did not support the admission of the kind of testimony Marshal Almonte will present.  However, the Court finds them to be inapposite for different reasons.  For example, in *United States v. Flores*, the question before the court was whether the admission of a Jesus Malverde picture was prejudicial enough to the co-defendant to compel severance of trials.  362 F.3d 1030, 1041 (8th Cir. 2004).   While the court found that severance was not required, there was no ruling on the general admissibility of such evidence.

Defendant's citation to *United States v. Echavarria-Olarte*, 904 F.2d 1391 (9th Cir. 1990), is similarly misguided.  In that case, the Government's expert provided extensive testimony regarding the Medillin Cartel, including the cartel's wide use of torture, bribery and murder.  That evidence had nothing to do with the elements of the offense on which the defendant was charged, and as a result, the court held the evidence to be prejudicial and therefore inadmissible.  The Government does not intend to offer Marshal Almonte's opinion for a similar purpose, and assures the Court that his proposed testimony will be closely tied to the facts and offenses in this case.

Defendant also cites to *United States v. Huerta, et al*., 2010 WL 145779 (E.D. Tenn. 2010), where the issue was whether Marshal Almonte would be allowed to testify that Mexican drug traffickers use these icons to protect them from law enforcement as "tools of the trade." The magistrate judge in that case had ruled that the slight relevance and probative value of Jesus Malverde images and symbols were "'far outweighed' by the danger of unfair prejudice."  2010

10

WL 145779, *3.[6]  The district judge was "skeptical about the admissibility" of Marshal Almonte's testimony, but deferred ruling pending a hearing on the matter.  The Government argues that the *Huerta* case comes out of a district that is not a border region of the United States, and the magistrate judge did not have as firm an understanding of the prevalence of Jesus Malverde paraphernalia in drug cases as would a court in a border state.  Tr. at 87.  Whether or not the Government's assessment of the *Huerta* case is correct, I do not find the *Huerta* case to be persuasive authority and it is certainly not controlling in this district.  In *U.S. v. Cardall*, 885 F.2d 656 (9th Cir. 1989), another case cited by Defendant, the issue did not concern Jesus Malverde icons, but rather 404(b) "bad acts" evidence of a co-conspirator, and testimony involving a drug cartel, neither of which are involved in the case before the Court here.

Accordingly, the Court concludes that Marshal Almonte's proffered testimony has met the *Daubert* requirements for reliability.  There is peer acceptance of the premise underlying this testimony by law enforcement officers targeting drug trafficking, and based on the collective knowledge of law enforcement officials working in this field.  Further, the reliability of this kind of testimony has been acknowledged by numerous courts in this Circuit and other circuits as well.

### III.  Relevance

The last part of a *Daubert* inquiry inquires into the relevance of the proffered opinion testimony.  Courts have generally found that testimony on items which can be considered "tools

---

[6] In *Huerta*, the magistrate judge ruled on several pending pretrial motions.  The government appealed the order issued by the magistrate judge concerning the admissibility of evidence related to icons and symbols of "La Santa Muerta" and "Jesus Malverde."  2010 WL 145779, *2.  It is unclear why the magistrate judge, as opposed to the district judge, addressed these evidentiary issues.

of the trade" is helpful to the jury in understanding the evidence. *See, e.g.*, *U.S. v. McDonald*, 933 F.2d 1519, 1522 (10th Cir. 1991) (finding that district court did not abuse its discretion by admitting expert testimony of law enforcement officer about "street level" drug dealing because jurors do not have "background knowledge of how a drug dealer works"); *U.S. v. Solis*, 923 F.2d 548 (7th Cir. 1991) (affirming use of expert testimony on use of beepers in drug trafficking). I have already found that Marshal Almonte's testimony concerns "tools of the trade." Thus, his opinion on this subject will be helpful to the jury and therefore is relevant in this case.

## CONCLUSION

In sum, the Court finds and concludes that the proffered testimony of the Government's expert witness, U.S. Marshal Robert Almonte, complies with *Daubert*'s requirements concerning expert qualifications, reliability, and relevance.

In the interest of thoroughness, the Court notes that Defendant has requested that the Court order the Government to produce documentation and information relating to Marshal Almonte's training. *See* Doc. 120 at 6, ¶ 11. I trust that by this time Defendant has received all information and material to which she is entitled under Fed.R.Crim.P. 16(a)(1)(G). If not, Defendant may raise this issue with the Court by separate formal pleading.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion in Limine Relating to Opinion Evidence **(Doc. 120)** is hereby DENIED, for reasons set forth in this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE